# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

CHARLES DEJUAN MORRIS,

    Petitioner,

vs.

MICHAEL BUDGE, et al.,

    Respondents.

Case No. 3:06-CV-00493-ECR-(RAM)

**ORDER**

    Before the Court are the Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (#7) and a Supplement (#18), Respondents' Answer (#46), Petitioner's Reply (#58) and Amended Reply (#59), and Petitioner's Motion for Partial Dismissal of Grounds 7, 8, 9, 10, 12, and 13 (#63). The Court dismisses those grounds for lack of exhaustion in state court. After reviewing the other documents, the Court concludes that relief is not warranted, and it denies the Petition.

    A jury in the Second Judicial District Court of the State of Nevada found Petitioner guilty of first-degree murder with the use of a deadly weapon, robbery with the use of a deadly weapon, and conspiracy to commit robbery with the use of a deadly weapon. Pursuant to Nev. Rev. Stat. § 175.552, the jury set Petitioner's sentence for first-degree murder to life imprisonment with the possibility of parole after 20 years. Ex. 147 (#51-36). For robbery, the trial judge sentenced Petitioner to a maximum term of 180 months and a minimum term of 72 months, and for conspiracy, the trial judge sentenced Petitioner to a maximum term of 72 months and a minimum term of 28 months. Pursuant to Nev. Rev. Stat. § 193.165, the trial judge imposed an equal and consecutive sentence on each count for the use of a deadly weapon. The trial judge ran the

sentences for all counts concurrently. Ex. 167 (#52-17). On appeal, the Nevada Supreme Court affirmed on most grounds. Shortly before the Nevada Supreme Court decided Petitioner's appeal, it had decided in the appeal of Petitioner's co-defendant, Ryan Moore, that the deadly-weapon enhancement did not apply to conspiracy; the court remanded for entry of an amended judgment of conviction that struck the deadly-weapon sentence for conspiracy. Ex. 217 (#53-17).

Petitioner then filed in the state district court a post-conviction habeas corpus petition and a supplement. Ex. 228 (#53-28); Ex. 240 (#53-42). The court conducted an evidentiary hearing. Ex. 256 (#54-5, #54-6). The state court then denied the petition. Ex. 269 (#54-19). Petitioner appealed, and the Nevada Supreme Court affirmed. Ex. 295 (#54-45).

Petitioner then commenced this action.

"A federal court may grant a state habeas petitioner relief for a claim that was adjudicated on the merits in state court only if that adjudication 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,'" Mitchell v. Esparza, 540 U.S. 12, 15 (2003) (quoting 28 U.S.C. § 2254(d)(1)), or if the state-court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

> A state court's decision is "contrary to" our clearly established law if it "applies a rule that contradicts the governing law set forth in our cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." A state court's decision is not "contrary to . . . clearly established Federal law" simply because the court did not cite our opinions. We have held that a state court need not even be aware of our precedents, "so long as neither the reasoning nor the result of the state-court decision contradicts them."

Id. at 15-16. "Under § 2254(d)(1)'s 'unreasonable application' clause . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) (internal quotations omitted).

> [T]he range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).

> When it comes to state-court factual findings, [the Antiterrorism and Effective Death Penalty Act] has two separate provisions. First, section 2254(d)(2) authorizes federal courts to grant habeas relief in cases where the state-court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Or, to put it conversely, a federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable. Second, section 2254(e)(1) provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and that this presumption of correctness may be rebutted only by "clear and convincing evidence."
>
> We interpret these provisions sensibly, faithful to their text and consistent with the maxim that we must construe statutory language so as to avoid contradiction or redundancy. The first provision—the "unreasonable determination" clause—applies most readily to situations where petitioner challenges the state court's findings based entirely on the state record. Such a challenge may be based on the claim that the finding is unsupported by sufficient evidence, that the process employed by the state court is defective, or that no finding was made by the state court at all. What the "unreasonable determination" clause teaches us is that, in conducting this kind of intrinsic review of a state court's processes, we must be particularly deferential to our state-court colleagues. For example, in concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record. Similarly, before we can determine that the state-court factfinding process is defective in some material way, or perhaps non-existent, we must more than merely doubt whether the process operated properly. Rather, we must be satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate.

Taylor v. Maddox, 366 F.3d 992, 999-1000 (9th Cir. 2004).

"Rule 7 of the Rules Governing § 2254 cases allows the district court to expand the record without holding an evidentiary hearing." Cooper-Smith v. Palmateer, 397 F.3d 1236, 1241 (9th Cir. 2005). The requirements of § 2254(e)(2) apply to a Rule 7 expansion of the record, even without an evidentiary hearing. Id. "An exception to this general rule exists if a Petitioner

exercised diligence in his efforts to develop the factual basis of his claims in state court proceedings." Id.

The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004).

In the early morning of February 8, 1998, Branson Clark was sitting in his car in a parking lot at the Vista West apartments in Reno. Somebody shot him with a SKS rifle, firing through and shattering a window in the car. Eyewitnesses saw men in the area before the shooting, and they saw men running away after the shooting. Police responded. They confirmed that Clark was dead. They recovered the rifle, a pistol, spent and live ammunition, and items of clothing. The investigation of the rifle led police to Ryan Moore and to Petitioner. Around 1:00 a.m. on February 15, 1998, detectives encountered Petitioner outside his apartment complex in Reno. Petitioner went with the detectives to the police station and gave a statement, in which he made some incriminating statements.

The Court will consider Supplemental Ground 1 first because it affects other grounds for relief. Petitioner contends that the Nevada Supreme Court erred in holding that Petitioner's rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), were protected and that his statement to police was admissible at the jury trial. The Nevada Supreme Court held:

> Morris next contends that his Miranda rights were violated because he was "in custody" for the first part of his interview and was not given Miranda warnings. We disagree. The district court determined that—considering the totality of the circumstances—Morris's freedom had not been so restrained that it could be objectively said that a reasonable person in his situation would not feel free to leave. We have reviewed the record and the videotape of Morris's interview with the police and conclude that substantial evidence supports the district court's determination.
>
> Morris next contends that he did not validly waive his Miranda rights at any point during his interview with the police. We must examine the totality of circumstances to determine whether Morris validly waived his rights. Although Morris arguably waived his rights implicitly at an earlier point, we conclude that he knowingly and voluntarily waived his rights during the dialogue recorded at page 756 of volume IV of the joint appendix. [Ex. I, p. 118 (#21-3, p. 27).]
>
> Morris next contends that his statements following the advisement of his rights were the product of interrogation and should have been excluded. For purposes of our analysis, because we conclude that Morris validly waived his rights, the part of the interview relevant to this argument is that small portion before he waived his rights. This part of the interview comprises merely a few pages of written transcript and contains no unduly prejudicial information. Thus, even assuming that part of the

-4-

1
2
    interview was improperly admitted, we conclude that the error was harmless because Morris suffered no prejudice by its admission.

3
4
5
6
    On this point, Morris argues further that the conversation that took place in the absence of an effective waiver served to taint any subsequent statements. The essence of this argument appears to be that there was some causal connection between Morris's unwarned statements and his statements following his waiver. We conclude that any connection between the two is "speculative and attenuated" at best and, in any event, the relevant inquiry is whether Morris validly waived his <u>Miranda</u> rights. Likewise, we conclude that there was substantial evidence supporting the district court's determination that Morris's statements were given voluntarily.

7 Ex. 217, pp. 1-3 (#53-17, pp. 2-4).[1]  The transcript of the interview shows that, at the start, the

8 detectives told Petitioner that he was free to stop the interview and leave if he wanted. Ex. I, pp. 8-9

9 (#21, pp. 35-36). After a while of Petitioner denying that he was present at the Vista West

10 apartments at the time of Clark's murder and the detectives insisting that they knew he was present,

11 Petitioner asked to go home. Ex. I, p. 106 (#21-3, p. 15). Detective Duncan stopped the interview,

12 went outside the interview room to speak with his sergeant, and learned that Petitioner had an

13 outstanding warrant for his arrest on an unrelated matter. Ex. 38, p. 21 (#48-39, p. 25). Detective

14 Duncan informed Petitioner that he was in custody and advised Petitioner of his <u>Miranda</u> rights. Ex.

15 I, p. 110 (#21-3, p. 19). The transcript shows that Petitioner discussed other matters with Detective

16 Duncan for a short while and then waived his <u>Miranda</u> rights. Ex. I, p. 118 (#21-3, p. 26). After

17 that waiver, Petitioner admitted that he was present at the Vista West apartments but that he

18 remained in the car while Moore and other men left to commit the crime. Ex. I, pp. 179-80 (#22-1,

19 pp. 10-11). Petitioner then admitted that he also left the car and was present at Clark's car when

20 Clark was murdered. Ex. I, p. 192 (#22-1, p. 23). At a hearing on the matter, the state district court

21 found that the statement in the first part of Petitioner's interview was voluntary, that Petitioner

22 understood that he had the right to leave, and that he had exercised his rights to decline providing

23 samples to officers, Ex. 108, p. 50 (#50-9, p. 52); The state district court also found that after his

24 arrest Petitioner understood the rights afforded to him and elected to proceed with his statements,

25 Ex. 108, p. 51 (#50-10, p. 2). These determinations were reasonable in light of the evidence

26

27
28
    [1]Page numbers in parentheses refer to the image of the document in the Court's computer docket.

presented. 28 U.S.C. § 2254(d)(2). Under these circumstances, the Nevada Supreme Court's ruling was a reasonable application of Miranda. 28 U.S.C. § 2254(d)(1).

Grounds 1 and 11 are claims that Petitioner's counsel, Dennis Widdis, suffered from a conflict of interest. Before the events at issue in this action occurred, a former law enforcement officer named John Poirer died. The police officers' association asked Detective Rod Dreher to serve as administrator of Poirer's estate, and the association asked Widdis to represent the estate in probate court. They settled the affairs of the estate and gave the assets to Poirer's legal heir. That was the extent of the relationship between Widdis and Dreher. Later, Dreher was one of the investigators into the murder of Clark. Dreher's involvement focused almost entirely upon Petitioner's co-defendant Moore. The trials of Moore and Petitioner were severed. Widdis disclosed this information to Petitioner, to the prosecution, and to the trial court. The court canvassed Petitioner on the matter, and Petitioner decided to continue with Widdis as his attorney.

The Court is not convinced that a conflict of interest even existed in this case. "In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, 446 U.S. 335, 350 (1980). The Court sees no adverse effect in this case. Widdis's representation of Dreher was in a probate matter that had nothing to do with the murder of Clark.

Furthermore, Petitioner waived any possible conflict of interest. Such a waiver must be knowing and voluntary. See United States v. Allen, 831 F.2d 1487 (9th Cir. 1987) (citing Edwards v. Arizona, 451 U.S. 477, 482 (1981)). The record shows that Widdis disclosed the extent of his representation of Dreher, that Petitioner understood those circumstances, and that he elected to continue with Widdis's representation of him.

On the question of a conflict of interest itself, the Nevada Supreme Court held:

> "Every defendant has a constitutional right to the assistance of counsel unhindered by a conflict of interest." Where a defendant can show an actual conflict of interest existed, the prejudice necessary to support an ineffective assistance of counsel claim is presumed. However, a defendant may waive objections to any actual or potential conflict by his counsel and continue to be represented by him, so long as the district court personally addresses the defendant and determines that he made a voluntary, knowing, and understanding waiver of the conflict.

> The record reveals that prior to trial Widdis at least twice disclosed to the district court, the State, and Morris what he believed could be a potential conflict between his probate work with Detective Dreher and his defense of Morris. To address Morris's concerns, Widdis explained in open court the nature and scope of his representation of Detective Dreher. Thereafter, the district court asked: "Mr. Morris, based on that disclosure, are you satisfied with this issue?" Morris replied, "Yes."
>
> During the post-conviction evidentiary hearing, Widdis testified that he informed Morris of his probate work with Detective Dreher, and Morris acknowledged that Widdis advises him of the matter and he agreed to have Widdis continue defending him. Even assuming that Widdis had a conflict of interest, the district court found that Morris waived it. Substantial evidence supported this conclusion, and it was not clearly wrong. We conclude the district court properly denied Morris relief on this claim.

Ex. 295, pp. 3-4 (#54-45, pp. 4-5) (citing, among other cases, Strickland v. Washington, 466 U.S. 668, 692 (1984), Holloway v. Arkansas, 435 U.S. 475 (1978)). That was a reasonable application of Sullivan. 28 U.S.C. § 2254(d)(1).[2]

Ground 2 concerns the admission of victim-impact evidence during the penalty phase of the trial. Petitioner argues that the district court erred in the admission of a booklet containing letters and poems and some testimony by Art Clark, Branson Clark's brother, that quoted the Bible. Widdis objected to the admission of the booklet, but he did not raise on appeal any issue of victim-impact evidence.

In the state habeas corpus appeal, the Nevada Supreme Court held that the claim of improper admission was procedurally barred because Petitioner did not raise it on direct appeal. However, the Nevada Supreme Court did reach the merits of a claim that Widdis provided ineffective assistance, which in turn addressed the admissibility of the evidence. It held:

---

[2] Conflict of interest was one of the issues at the evidentiary hearing on the state habeas corpus petition. Widdis testified that he represented Donald Coleman in post-conviction proceedings and succeeded in having Coleman's conviction reversed because of a conflict of interest. In Coleman's case, an attorney named George represented both Coleman and another defendant named Acklin. Coleman and Acklin shared the same cell in jail. Coleman told Acklin that he had committed murder. Acklin told George about Coleman's statement. George obtained favorable treatment for Acklin by having Acklin relate Coleman's statement to the prosecutors. That statement was admitted at Coleman's trial. Coleman v. State, 846 P.2d 276, 277 (Nev. 1993). Widdis, as much as any other attorney, knew of the dangers of a conflict of interest.

-7-

> Second, Morris contends that the district court improperly denied his claim that Widdis was ineffective for failing to challenge on direct appeal the admission of victim impact evidence during his penalty hearing. He contends that a booklet of pictures, poems, and letters, several of which were read to the jury, were outside the scope of admissible victim impact evidence. Had Widdis brought this issue to the attention of this court on direct appeal, Morris maintains, he would have been granted relief and a new penalty hearing ordered. We disagree.
>
> A district court's decision to admit victim impact evidence during a penalty hearing is reviewed for an abuse of discretion. NRS 176.015(3)(b) provides that a victim shall be afforded an opportunity to "[r]easonably express any views concerning the crime, the person responsible, the impact of the crime on the victim and the need for restitution." And this court has held that "individuals outside the victim's family can present victim impact evidence," which has included letters from them. However, the admission of victim impact evidence is not without limitations. Such evidence must be excluded if it renders the proceedings fundamentally unfair, its probative value is substantially outweighed by the danger of unfair prejudice, it confuses the issues, or it misleads the jury.
>
> We have reviewed the impact evidence at issue. Even if Morris had challenged the impact evidence on direct appeal, we conclude that any error by the district court in admitting it was harmless. Thus, there is no reasonable likelihood that Morris would have received any relief had Widdis raised this matter on direct appeal. We conclude the district court properly denied Morris relief on this post-conviction claim.

Ex. 295, pp. 4-5 (#54-45, pp. 5-6) (footnotes omitted). The Nevada Supreme Court used the same rule that the Supreme Court of the United States has applied to state-court rulings on the admissibility of evidence: They do not violate the Due Process Clause of the Fourteenth Amendment unless they render the proceedings fundamentally unfair. Estelle v. McGuire, 502 U.S. 62, 67-68, 75 (1991). Branson Clark's father read aloud to the jury some letters. Ex. 150, pp. 257-75 (#51-39, p. 49 through #51-40, p. 15). Branson Clark's brother quoted the Old Testament. Ex. 150, pp. 278-79 (#51-40, pp. 18-19). However, the Nevada Supreme Court could reasonably conclude that the testimony of Branson Clark's mother and father had far greater impact, and thus the letters and biblical quotation did not make the penalty hearing unfair. 28 U.S.C. § 2254(d)(1).

In Ground 3, Petitioner contends that his sentence is unconstitutional, because it is the same as his co-defendant Ryan Moore. Petitioner argues that Moore was more culpable because he had a more violent and extensive criminal history. As with Ground 2, Petitioner did not raise this claim on direct appeal. In the state habeas corpus appeal, the Nevada Supreme Court ruled:

> Third, Morris contends that the district court improperly denied his claim that Widdis was ineffective for failing to challenge his sentence on direct appeal. He maintains that the district court abused its discretion in sentencing him to the same sentence as

> codefendant, Ryan Moore, because Moore had a more violent criminal history and greater involvement in the instant crimes than he did. We disagree.
>
> A district court is afforded wide discretion when sentencing, and this court will not interfere with its decision "[s]o long as the record does not demonstrate prejudice resulting from consideration of information or accusations founded on facts supported only by impalpable or highly suspect evidence."
>
> Morris's sentence was within the statutory limits, and he has failed to demonstrate that the district court abused its discretion in imposing it. That his codefendant Moore may have received an identical sentence is not a basis for relief. Thus, a challenge to Morris's sentence on direct appeal on these grounds had no likelihood of success. We conclude the district court properly denied Morris relief on this claim.

Ex. 295, pp. 5-6 (#54-45, pp. 6-7) (footnotes omitted). The Eighth Amendment prohibits grossly disproportionate sentences. Lockyer v. Andrade, 538 U.S. 63, 71-73 (2003) (citing Harmelin v. Michigan, 501 U.S. 957 (1991); Solem v. Helm, 463 U.S. 277 (1983); Rummel v. Estelle, 445 U.S. 263 (1980)). A life sentence for first degree murder is a reasonable application of Harmelin. With that in mind, the Nevada Supreme Court reasonably applied Strickland when it determined that Widdis's decision not to raise this issue was not ineffective assistance of counsel. 28 U.S.C. § 2254(d)(1).[3]

---

[3] The Court has followed the arguments of the parties and the decisions of the state courts, but they seem to be at odds with Nevada's sentencing procedures. The jury, not the judge, sets the sentence for first degree murder. Nev. Rev. Stat. § 175.552. Petitioner does not argue that the judge had the discretion to reduce Petitioner's sentence for first degree murder; in the capital context, at least, the judge does not have that discretion. See Hardison v. State, 763 P.2d 52 (Nev. 1988). Petitioner does not argue that § 175.552 is somehow constitutionally deficient. Petitioner and Moore were tried separately before different juries. In each case, the jury found the defendant guilty and set the sentence at life imprisonment with the possibility of parole. See Morris v. Helling, Case No. 3:05-CV-00348-KJD-(VPC), Petitioner's Ex. 59 (#28-1). Petitioner's jury went first. It was impossible for Petitioner's jury to know what Moore's jury would do, first because Petitioner's jury had no knowledge of the criminal proceedings against Moore, and second because Petitioner's jury could not see into the future. The same judge sentenced both defendants at the same time. The sentencing judge gave each defendant the same sentences. Pursuant to Nev. Rev. Stat. § 193.165, the use of a deadly weapon enhanced the sentences for murder and robbery with equal and consecutive terms, but the sentences for all counts run concurrently. Each defendant's sentences for robbery with the use of a deadly weapon and for conspiracy will fully expire before each defendant becomes eligible for parole and release from imprisonment on the sentence of first degree murder with the use of a deadly weapon. Therefore, Petitioner would not have gained any practical benefit if the judge imposed lesser sentences upon him for robbery with the use of a deadly weapon or for conspiracy. Petitioner could have received a lesser effective sentence than Moore only if the judge

1   In Ground 4, Petitioner claims that Widdis failed to appeal the deadly-weapon
2 enhancement and the giving of Jury Instruction 49. That instruction states:

> As used throughout these instructions, a firearm is a deadly weapon.
>
> If you find the defendant guilty of any of the counts charged, it will be your duty to determine whether such crimes were committed with the use of a deadly weapon and to state that in your verdict.
>
> In order to "use" a deadly weapon, there need not be conduct which actually produces harm but only conduct which produces a fear of harm or force by means of display of a deadly weapon in aiding the commission of a crime.

8 Ex. 145 (#51-34, p. 53). The only part of that instruction that might be objectionable is the
9 definition of "use," which is irrelevant in Petitioner's case because Branson Clark actually was shot
10 and killed with a firearm. Petitioner might have meant to refer to Jury Instruction 50. It states:

> The possession necessary to justify the finding of use of a deadly weapon may be actual or constructive; it may be exclusive or joint. Constructive or joint possession may occur only where the unarmed defendant has knowledge of the other offender's being armed, and where the unarmed defendant has the ability to exercise control over the firearm.
>
> The participation of a defendant not actually in possession of the weapon by aiding and abetting the actual user in the unlawful use of the weapon, makes the former equally subject to the added penalty inflicted upon defendants who actually commit crimes through the use of deadly weapons. For example, where an unarmed defendant has knowledge of the use of the deadly weapon and by his actual presence participates in the robbery, the unarmed defendant benefits from the use of the other robber's weapon, adopting derivatively its lethal potential.

18 Ex. 145 (#51-34, p. 54). See Allen v. State, 609 P.2d 321, 322 (Nev. 1980); see also NRS 193.165.
19   "[T]he right to counsel is the right to the effective assistance of counsel." McMann
20 v. Richardson, 397 U.S. 759, 771 & n.14 (1970). A petitioner claiming ineffective assistance of
21 counsel must demonstrate (1) that the defense attorney's representation "fell below an objective
22 standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and (2) that the
23 attorney's deficient performance prejudiced the defendant such that "there is a reasonable
24 probability that, but for counsel's unprofessional errors, the result of the proceeding would have
25 been different," id. at 694. "[T]here is no reason for a court deciding an ineffective assistance claim

---

directed that Moore's sentences for each count ran consecutively. That type of "relief" is beyond the power of this Court to grant.

-10-

to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697.

In the state habeas corpus appeal, the Nevada Supreme Court held:

> Fourth, Morris contends that the district court improperly denied his claim that Widdis was ineffective for failing to challenge Jury Instruction 50 on direct appeal. He contends that the instruction was erroneous and he should not have been held criminally liable for a deadly weapon enhancement for the robbery or the murder because he neither used a deadly weapon nor was aware one was going to be used in those crimes. We disagree.
>
> Jury Instruction 50 was an accurate statement of the law. Moreover, this court concluded on direct appeal that sufficient evidence supported Morris's conviction, which included the jury's finding that he was criminally liable for the use of a deadly weapon—a firearm—in the commission of both the robbery and the murder. Morris has failed to demonstrate that there was any likelihood of success had Widdis challenged Jury Instruction 50 on direct appeal. We conclude the district court properly denied Morris relief on this claim.

Ex. 295, pp. 6-7 (#54-45, pp. 7-8). Regarding the sufficiency of the evidence, on direct appeal the Nevada Supreme Court held:

> [R]egardless of who actually pulled the trigger, Morris would have been equally liable under the State's aiding and abetting theory.

Ex. 217, p. 3 (#53-17, p. 2). If Plaintiff was either the shooter or the accomplice, then he would have been liable for the deadly-weapon enhancement. Widdis could not have succeeded with this ground on direct appeal. The Nevada Supreme Court applied Strickland reasonably. 28 U.S.C. § 2254(d)(1).

Ground 5 and Supplemental Ground 2 concern Widdis's advice to Petitioner not to testify. In Ground 5, Petitioner argues that Widdis told him not to testify because two prior convictions could be admitted to impeach him, but that Widdis did not investigate whether those convictions were admissible. In Supplemental Ground 2, Petitioner argues that because he did not testify, the jury did not hear his theory of the case: "[T]hat he was not the shooter, that he had abandoned the crimes, and was only at the location because he was attempting to retrieve Moore and the other two men to return to the vehicle and go home." Supplemental Petition, p. 33 (#18). At the evidentiary hearing, Widdis testified that he told Petitioner that Petitioner should not testify because he did not believe that Petitioner would be a persuasive witness, because he did not believe that

-11-

Petitioner would do well on cross-examination, and because evidence of Petitioner's prior convictions might be admitted. Ex. 256, pp. 45-46 (#54-5, p. 16). In the state habeas corpus appeal, the Nevada Supreme Court held:

> Fifth, Morris contends that the district court improperly denied his claim that Widdis was ineffective for advising him not to testify in his own defense at trial because two prior convictions could be admitted by the State to impeach him. We disagree.
>
> Widdis testified during the evidentiary hearing that he advised Morris not to testify because he "didn't believe that he would be a persuasive witness." Widdis could not recall whether he also advised Morris that his prior convictions might be admitted to impeach him. Morris testified at the hearing only that Widdis advised him not to testify because his prior convictions "might come in," not that they definitely would. Even assuming Morris's testimony was true, he failed to demonstrate that Widdis's advice was unreasonable. He also failed to show that had he testified there was a reasonable probability of a different outcome to his trial. We conclude the district court properly denied Morris relief on this claim.

Ex. 295, pp. 7-8 (#54-45, pp. 8-9). Regardless of the admissibility of Petitioner's prior convictions, the transcript of Petitioner's interview with police shows that Widdis gave good advice. First, Petitioner denied that he was present at the Vista West apartments on the night of February 7-8, 1998. Next, Petitioner admitted that he was present at the apartments but stated that he remained at the car while the others left. Ex. I, pp. 179-80 (#22-1, pp. 10-11). Finally, Petitioner admitted that he knew of the plan to commit a robbery, that he left the car with the others, and that he was present at Clark's car when Clark was killed. Ex. I, p. 192 (#22-1, p. 23). Petitioner told the police three stories, each more incriminating than the last. The jury heard those stories. Petitioner would have told the jury a fourth story. A reasonable attorney could conclude that a jury would not be inclined to believe a person whose theory of the case changes repeatedly. The Nevada Supreme Court applied Strickland reasonably.

Ground 6 and Supplemental Ground 3 concern the hair samples taken from Petitioner. Police recovered a ski mask at the scene of the crime, and DNA testing matched hairs found on the mask with sample hairs obtained from Petitioner. The detective who took those samples did not note how many hairs he was taking. Petitioner claims that Widdis should have investigated the chain of custody, possibly to show that some of the sample hairs had been planted upon the ski mask. On this issue, the Nevada Supreme Court held:

> Finally, Morris contends that the district court improperly denied his claim that Widdis was ineffective for failing to move to suppress DNA evidence from his hair samples relied upon by the State to prove his guilt. He asserts that this evidence was "planted" by authorities and that Widdis was ineffective for not conducting a more thorough investigation into its chain of custody. We disagree.
>
> The district court did not specifically address this issue in its final order, and our review of the pleadings reveals that this claim is buried within the text of a memorandum filed to support Morris's petition. It is questionable whether this claim was properly raised below in the first instance. The State, however, does not make this argument, and this issue was discussed, albeit briefly, during Morris's evidentiary hearing.
>
> Assuming that this claim is properly before us, we conclude that it is without merit. Although Widdis acknowledged during the evidentiary hearing that he could have investigated this matter better, Morris failed to demonstrate that Widdis was ineffective for not doing so. His assertion that samples of his hair were "planted" is a speculative, naked allegation void of any evidentiary support.
>
> Morris also failed to demonstrate that a more thorough investigation by Widdis into this matter would have revealed any such support. We conclude that Morris was not entitled to relief on this matter. . . .

Ex. 295, pp. 8-9 (#54-45, pp. 9-10). At the evidentiary hearing on the state habeas corpus petition, Widdis testified that in retrospect, the lack of a note on the number of hairs could be a problem in the chain of custody, because it could have allowed an unscrupulous detective to take some of the sample hairs and place them upon the ski mask. Ex. 256, p. 38 (#54-5, p. 14). However, Richard Berger, who analyzed those hairs, listed the chain of custody on direct examination by the prosecution. Ex. 139, pp. 546-47 (#51-21, pp. 11-12). An unscrupulous detective could not have placed hairs on the ski mask, unless any or all of the employees listed on the chain of custody lied. Plaintiff does not explain how further examination by Widdis on the chain of custody could have led to a different result. The Nevada Supreme Court applied Strickland reasonably. 28 U.S.C. § 2254(d)(1).

Reasonable jurists might find the Court's conclusions to be debatable, so the Court grants a certificate of appealability.

IT IS THEREFORE ORDERED that Petitioner's Motion for Partial Dismissal of Grounds 7, 8, 9, 10, 12, and 13 (#63) is **GRANTED**.

///

///

IT IS FURTHER ORDERED that the Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (#7) and the Supplement (#18) are **DENIED**. The Clerk of the Court shall enter judgment accordingly.

IT IS FURTHER ORDERED that a certificate of appealability is **GRANTED** on the following issues:

1. Whether this Court was correct in its ruling that the state courts reasonably applied Miranda v. Arizona, 384 U.S. 436 (1966);

2. Whether this Court was correct in its ruling that Petitioner did not suffer from a conflict of interest resulting from counsel's representation of a police detective in an unrelated probate case;

3. Whether this Court was correct in its ruling that the state courts reasonably applied clearly established federal law regarding the admission of victim-impact evidence;

4. Whether this Court was correct in its ruling that the state courts reasonably applied clearly established federal law regarding the equality of Petitioner's sentence with the sentence of co-defendant Ryan Moore;

5. Whether this Court was correct in its ruling that the state courts reasonably applied clearly established federal law regarding counsel's decision not to appeal Jury Instruction 50 on the possession necessary to find that Petitioner used a deadly weapon;

6. Whether this Court was correct in its ruling that the state courts reasonably applied clearly established federal law regarding counsel's advice to Petitioner not to testify at trial; and

7. Whether this Court was correct in its ruling that the state courts reasonably applied clearly established federal law regarding counsel's lack of investigation and questioning into the chain of custody of hair samples taken from Petitioner.

DATED: February 22, 2010

_____
EDWARD C. REED
United States District Judge